# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

**ANDRE GRANT,**

     *Plaintiff,*

**v.**                                                                    **Case No. SA-21-CV-1172-JKP**

**RENTGROW, INC., and**
**TRANSUNION RENTAL**
**SCREENING SOLUTIONS, INC.,**

     *Defendants.*

## MEMORANDUM OPINION AND ORDER

Before the Court are three related motions: (1) *Plaintiff's Motion for Partial Summary Judgment Against RentGrow, Inc.* (ECF No. 100); (2) *Defendant RentGrow, Inc.'s Motion for Summary Judgment* (ECF No. 102); and (3) *Defendant RentGrow, Inc.'s Motion for Summary Judgment* (ECF No. 107) filed under seal. The third motion is merely an unredacted version of the second motion. With relevant briefing by Plaintiff (ECF Nos. 111 (response) and 116 (reply)) and RentGrow (ECF Nos. 113 (redacted response), 115 (unredacted response), 118 (redacted reply), and 121 (unredacted reply)),[1] the motions are fully briefed. After considering the motions, related briefing, relevant pleadings, submitted evidence,[2] and applicable law, the Court denies each motion for summary judgment.

---

[1] Because redacted and unredacted filings are merely copies of the same documents, the Court will cite to only unredacted versions while maintaining appropriate confidentiality of the sealed matters. Because exhibits provided with the redacted ECF No. 113 are not included with the unredacted ECF No. 115, the Court will cite to exhibits provided with ECF No. 113.

[2] Both sides have submitted exhibits with their motions. Plaintiff provides twenty-three exhibits with his motion, *see* ECF No. 100-1 through 100-23 (Exs. 1-8, 15-18, 20-26, 28-29, 30-31), ten sealed exhibits separately, *see* ECF No. 106 (Ex. 9) and 106-1-10 (Exs. 10-17, 19, and 27), and one exhibit with his response brief, *see* ECF No. 111-1 (Ex. 1). Plaintiff provides Exhibits 15, 16, and 17 in both filings. Defendant RentGrow provides three exhibits with its response, *see* ECF No. 113-1 through 113-3 (Exs. A, B, and C), fourteen with its redacted motion, *see* ECF No. 102-1 through 102-14 (Exs. A through N, with Ex. H being a placeholder), one with its unredacted motion, *see* ECF No. 107-1 (Ex. H), and one with its redacted reply brief, *see* ECF No. 118-1 (Ex. A). For ease of reference, the Court will generally cite to exhibits by ECF No.

## I. BACKGROUND[3]

On October 29, 2021, Plaintiff and a friend sought to rent an apartment at Berkshire Creekside ("Berkshire") apartments. ECF No. 100-17 (Berkshire_00001 to 00028) at 6-10 (co-applicant's application), 11-14 (Plaintiff's application). In his application, Plaintiff stated that he had never been evicted and "ha[s] court documents that state, no eviction took place." *Id*. at 11.

As part of the application process, Berkshire required Plaintiff to consent to a background check. On November 1, 2021, Berkshire requested information about Plaintiff from Defendant RentGrow, Inc. ("RentGrow"). Upon receiving a request for tenant screening information on a particular applicant, RentGrow collects information from various sources and then transmits the information to its customer as part of a tenant screening report. In this case, it obtained a consumer report from Trans Union Background Data Solutions ("TUBDS"), another consumer reporting agency. Such reports can include information regarding public court records of eviction proceedings. And in this case, the report included information about a 2017 Forcible Detainer action against Plaintiff. Furthermore, Plaintiff had previously been sued in an eviction-related action in Harris County, Texas, in 2017.

TUBDS engages LexisNexis to collect records as a public records researcher and vendor in order for TUBDS to prepare its consumer report. In this case, TUBDS provided RentGrow with information about Civil Case No. 175200078271, which indicated a "Forcible Detainer" action had been filed against Plaintiff on March 7, 2017. *See* ECF No. 100-15 (Ex. 22). The provided information did not include any disposition, disposition date, or the identity of the prevailing party. *See id*. Nor does the provided information mention "Possession" at all. *See id*.

When RentGrow receives eviction proceeding record data from a TUBDS consumer report,

---

[3] The factual background is uncontested unless otherwise noted. When the parties agree to factual matters through their statements of fact, the Court may rely on such undisputed facts without citing to the record. Still, at times, the Court will cite to appropriate presented evidence.

it categorizes the records into four types based on the "Filing Type" reported by TUBDS: (1) new suit filings; (2) monetary judgments; (3) "possession/forcible detainers"; and (4) dismissals. In addition, based on the information provided by TUBDS, RentGrow generates a "Result" for the applicant that appears on the tenant screening report. It determines that "Result" by applying the customer's pre-determined tenant selection criteria against the information identified about the applicant. It is not based on any independent assessment by RentGrow about the applicant's eligibility. In this case, Berkshire's tenant screening criteria required a "decline" result for any applicant with a forcible detainer record in the past seven years.

RentGrow provided a tenant screening report regarding Plaintiff to Berkshire the same day Berkshire requested it. The supplied "Screening Report" indicated a screening result of "Decline." *See* ECF No. 100-3 (RG_Grant000007 to 000010) at 7 (also on file as ECF No. 102-3). The supplied report provides two reasons for that result: "Civil Court History Does Not Meet Property Requirements" and "Limited Credit Experience." *Id*. In a section addressing civil court record searches, the supplied report shows a "Forcible Detainer" civil action with a notation of "Possession" on March 7, 2017. [4] *Id*. at 9. In an acknowledgement section, the supplied report states:

> Any credit, criminal, civil or rental history information about the individual to whom this tenant screening report pertains was obtained from public records or third-party consumer reporting agencies. RentGrow, Inc. follows reasonable procedures to assure maximum possible accuracy of the information in this report but cannot guarantee the accuracy or truthfulness of the records. RentGrow will suppress information that the applicant disputes as inaccurate or incomplete, and will notify you of the results of any dispute.

*Id*. RentGrow agrees that the supplied report "does not indicate that the case was dismissed or that a final judgment was entered in favor of Plaintiff." ECF No. 100-8 (Supp. Resp. to Request for Admission No. 1).

---

[4] Although Plaintiff often states that RentGrow's consumer report regarding him indicates that the forcible detainer action filed March 7, 2017, resulted in a judgment for possession or eviction on March 7, 2017, *see*, *e.g.*, ECF No. 111 at 3, RentGrow's report speaks for itself and never mentions any judgment for possession or uses the term eviction. It merely has a notation of "POSSESSION on 03/07/2017." ECF No. 100-3 at 9.

In general, Berkshire denied Plaintiff's application because, "according to RentGrow, he didn't meet [Berkshire's] property standards" but Berkshire also noted that it was worth mentioning that "he was co-applying with somebody else." *See* Dep. Medelin (ECF No. 100-16) 12:17-23. Berkshire sent both applicants an adverse action letter. *See* ECF No. 100-17 (Berkshire_00001 to 00028) at 2-5. For each applicant it listed the negative factors for the denial decision for the group. *Id.* 2, 4. Plaintiff's co-applicant had "No Credit Experience" and Plaintiff had two negative factors – "Civil Court History Does Not Meet Property Requirements" and "Limited Credit Experience." *Id.*

Plaintiff, however, had not been evicted and no judgment for possession had been entered against him. Contrary to RentGrow's consumer report and TUBDS's provided information, the forcible detainer action was initiated on February 14, 2017, and was dismissed in Plaintiff's favor on March 7, 2017. Plaintiff disputed the accuracy of Defendant's report on grounds that it did not indicate that the case had been dismissed. Defendant forwarded the dispute to TUBDS, the vendor of the inaccurate record. ECF No. 100-6 (Resp. to Interr. 11). Defendant uses third-party entities, like TUBDS, to obtain consumer information. Decl. Grinberg (ECF No. 102-11) ¶ 6. After TUBDS updated its reinvestigation results to reflect a "Civil Dismissal" filing type with a March 7, 2017 release date and a February 14, 2017 filing date, Defendant omitted the dismissed eviction action from its updated report per corporate policy not to report dismissed cases. Defendant thereafter sent Berkshire an updated Screening Report showing a result of "Conditional (Pending Management Approval)." ECF No. 100-4 (RG_Grant000087 to 000089) at 87. Berkshire then offered Plaintiff an apartment to rent. *See* Dep. Medelin 14:1-6.

Plaintiff commenced this case on November 23, 2021, by filing a civil complaint alleging two claims under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681e(b) and 1681i. *See* Compl. (ECF No. 1) ¶¶ 76-99. He asserted each claim against two defendants: RentGrow and Transunion Rental Screening Solutions, Inc. ("TURSS"). *See id.*

On March 30, 2022, Plaintiff provided notice that he and TURSS "settled all claims between them in this matter." ECF No. 26. On May 19, 2022, Plaintiff and TURSS filed a stipulation of dismissal pursuant to Fed. R. Civ. P. 41 to dismiss all claims and defenses as to TURSS with prejudice. *See* ECF No. 31. Further, on November 29, 2022, Plaintiff filed a Stipulation of Dismissal to dismiss Claim 2 against RentGrow with prejudice. *See* ECF No. 99. Thus, at this point, Plaintiff proceeds only with Claim 1 against RentGrow (sometimes referred to as "Defendant" hereinafter).

In his only remaining claim, Plaintiff alleges that Defendant violated 15 U.S.C. § 1681e(b). Compl. ¶ 77. He alleges that Defendant "willfully, intentionally, recklessly, and negligently violated § 1681e(b) because [it] failed to follow reasonable procedures to ensure maximum possible accuracy of the information attributable to Plaintiff." *Id*. ¶ 78.

Through his motion, Plaintiff seeks partial summary judgment as to Defendant's liability, while allowing "a jury to evaluate willfulness and the amount of damages to which he is entitled." ECF No. 100 at 20. Defendant, on the other hand, argues that it is entitled to summary judgment on the sole remaining claim, Plaintiff cannot demonstrate a willful violation, and Plaintiff cannot receive a double recovery for the same alleged injury. *See* ECF No. 107 at 7-17.

## II. SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[5] Fed. R. Civ. P. 56(a). "As to materiality, the substantive law will identify which facts are material" and facts are "material" only if they "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over material facts qualify as

---

[5] The summary judgment standard "remains unchanged" despite 2010 amendments to Fed. R. Civ. P. 56 that replaced "issue" with "dispute." Fed. R. Civ. P. 56 advisory committee notes (2010 amend.). Although the standard remains the same, the Court utilizes the amended terminology even when relying on caselaw that predates the amendments.

"genuine" within the meaning of Rule 56 when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Given the required existence of a genuine dispute of material fact, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id.* at 247-48. A claim lacks a genuine dispute for trial when "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). This includes identifying those portions of the record that the party contends demonstrate the absence of a genuine dispute of material fact. *Id*. When seeking summary judgment on an affirmative defense, the movant "must establish beyond peradventure" each essential element of the defense. *Access Mediquip LLC v. UnitedHealthcare Ins. Co.*, 662 F.3d 376, 378 (5th Cir. 2011), *adhered to on reh'g en banc*, 698 F.3d 229 (5th Cir. 2012); *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986).

But when "the nonmovant bears the burden of proof at trial, the movant may merely point to an absence of evidence, thus shifting to the non-movant the burden of demonstrating by competent summary judgment proof that there is [a genuine dispute] of material fact warranting trial." *Lyons v. Katy Indep. Sch. Dist.*, 964 F.3d 298, 301-02 (5th Cir. 2020) (quoting *In re: La. Crawfish Producers*, 852 F.3d 456, 462 (5th Cir. 2017)). The movant need not "negate the elements of the nonmovant's case." *Austin v. Kroger Tex., LP*, 864 F.3d 326, 335 (5th Cir. 2017) (emphasis omitted) (parenthetically quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1076 n.16 (5th Cir. 1994) (en banc)). In these instances, however, the movant must "point[] out that there is no evidence to support a *specific element* of the nonmovant's claim"; rather than making "a conclusory assertion that the nonmovant has no evidence to support his *case*." *Id*. at 335 n.10.

In considering a motion for summary judgment, courts view all facts and reasonable inferences drawn from the record "in the light most favorable to the party opposing the motion." *Heinsohn v. Carabin & Shaw, P.C.*, 832 F.3d 224, 234 (5th Cir. 2016) (citation omitted). Once the movant has carried its summary judgment burden, the burden shifts to the non-movant to establish a genuine dispute of material fact. With this shifting burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "Unsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." *Heinsohn*, 832 F.3d at 234 (citation omitted). Additionally, the courts have "no duty to search the record for material fact issues." *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010); *accord Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012).

### III. FCRA

The Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq., "seeks to promote 'fair and accurate credit reporting' and to protect consumer privacy." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2200 (2021) (quoting § 1681(a)). Given these "goals, the Act regulates the consumer reporting agencies that compile and disseminate personal information about consumers." *Id*. In doing so, it "imposes a host of requirements concerning the creation and use of consumer reports." *Spokeo, Inc. v. Robins*, 578 U. S. 330, 335 (2016).

The Act provides consumers a civil remedy for damages against "[a]ny person" who willfully or negligently fails "to comply with any requirement imposed under [§ 1681 et seq.]." *See* 15 U.S.C. §§ 1681n (willful noncompliance), 1681o (negligent noncompliance). Courts "treat negligent noncompliance and willful noncompliance as distinct (but largely overlapping) claims." *See McIntyre v. RentGrow, Inc.*, 34 F.4th 87, 92 (1st Cir. 2022).

Section 1681e governs compliance procedures applicable to every consumer reporting agency ("CRA"). *See* 15 U.S.C. § 1681e(a). "Whenever a consumer reporting agency prepares a

consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." *Id*. § 1681e(b). To succeed on his § 1681e(b) claim against RentGrow, Plaintiff must prove four elements: (1) RentGrow "prepared a consumer report concerning h[im] that contained inaccurate information"; (2) the inaccuracy was due to RentGrow's "failure to follow reasonable procedures to assure maximum possible accuracy"; (3) Plaintiff "suffered a cognizable injury"; and (4) causation linking RentGrow's failure to that injury. *See Saunders v. Equifax Info. Servs. LLC*, No. 16-CV-00525-LY, 2017 WL 3940942, at *3 (W.D. Tex. Aug. 3, 2017), *aff'd sub nom. Ostiguy v. Equifax Info. Servs., LLC*, 738 F. App'x 281 (5th Cir. 2018). "A credit entry may be 'inaccurate' within the meaning of the statute either because it is patently incorrect, or because it is misleading in such a way and to such an extent that it can be expected to adversely affect credit decisions." *Sepulvado v. CSC Credit Servs., Inc.*, 158 F.3d 890, 895 (5th Cir. 1998). And "a material omission is actionable under § 1681e(b)." *Chaitoff v. Experian Info. Sols., Inc.*, ___ F.4th ___, ___, No. 21-2632, 2023 WL 5200125, at *7 (7th Cir. Aug. 14, 2023).

Consumers, like Plaintiff, "bear[] the ultimate burden" to establish each of these essential elements. *Hurst v. Equifax Info. Servs., LLC*, No. SA-20-CV-1366-JKP-ESC, 2021 WL 5926125, at *5 (W.D. Tex. Dec. 15, 2021). As recognized by the Fifth Circuit, some courts "read the 'reasonable procedures' requirement as a limit on liability that might otherwise attach for inaccurate reports, rather than as an affirmative basis for a claim." *Washington v. CSC Credit Servs. Inc.*, 199 F.3d 263, 267 n.3 (5th Cir. 2000) (seeming to accept that reading while not expressly adopting it). This is consistent with the view that the FCRA "does not impose strict liability for inaccurate entries." *Sepulvado*, 158 F.3d at 896.

But *Sepulvado* also expressly holds that "the plaintiff must show that the inaccuracy resulted from a negligent or willful failure to use reasonable procedures when the report was prepared." *Id*. This showing is part of the plaintiff's ultimate burden. However, as to the

reasonableness of procedures, it need not be an onerous burden.

For instance, as to "the reasonableness or unreasonableness of defendant's procedures under § 1681e(b)," some courts have stated that "the burden is minimal and plaintiff need not introduce direct evidence of the unreasonableness of the procedures." *Anderson v. Trans Union, LLC*, 345 F. Supp. 2d 963, 970-71 (W.D. Wis. 2004) (discussing cases). In some circumstances, "'inaccurate credit reports by themselves can fairly be read as evidencing unreasonable procedures,' such as when two different reports on the same consumer are inconsistent or the agency has two similar files on the same consumer." *Id*. at 971 (quoting *Stewart v. Credit Bureau, Inc.*, 734 F.2d 47 (D.C. Cir. 1984) (per curiam)). The Ninth Circuit has even held that "a consumer need only produce evidence 'tending to show that a credit reporting agency prepared a report containing inaccurate information.'"[6] *Id*. (quoting *Guimond v. Trans Union Credit Information Co.*, 45 F.3d 1329, 1333 (9th Cir. 1995)). And "[o]nce the consumer has done this, the 'agency can escape liability if it establishes that an inaccurate report was generated despite the agency's following reasonable procedures.'" *Id*. (same).

The Ninth Circuit's view is consistent with the indication in *Washington* that the requirement of reasonable procedures is not an affirmative basis for a claim, but rather a means to escape liability. But it may not fully encompass the view set out in *Sepulvado* which expressly requires the plaintiff to show that a negligent or willful failure to use reasonable procedures resulted in the inaccuracy. It is not surprising that courts express the requisite showing differently given the nature of the reasonableness concept, which is fact-intensive and not easily applied without specifics.

"The adequacy of the consumer reporting agency's procedures is judged according to what a reasonably prudent person would do under the circumstances." *Cousin v. Trans Union Corp.*,

---

[6] Although the statute uses and defines consumer reporting agency, *see* 15 U.S.C. § 1681a(f), courts and others often use credit reporting agency, *see*, *e.g.*, *Guimond*, 45 F.3d at 1333. The Court will not differentiate between the two phrases.

246 F.3d 359, 368 (5th Cir. 2001). The nature of an inaccuracy undoubtedly impacts what a reasonably prudent person would do. Given the vast spectrum of circumstances, the standard for evaluating the reasonableness of a CRA's procedures is necessarily fact specific. At one end of the spectrum lies circumstances that permit a plaintiff to carry the burden to show a failure to use reasonable procedures by simply showing that the consumer report contains inaccurate information. Further along the spectrum, other circumstances may require a greater showing than mere inaccuracy for plaintiffs to carry their burden. And at the other end of the spectrum lies circumstances that simply do not call into question the reasonableness of the procedures used.

The more obvious or patently incorrect a credit entry is, the more likely that an inaccuracy alone will suffice as evidence of the unreasonableness of the procedures used. The nature of the inaccuracy itself carries the burden. Of course, this does not impose strict liability because the defendant may add other facts to consider and may thereby escape liability by showing that it followed reasonable procedures under the circumstances. At the end of the day, the trier of fact will consider all the circumstances to determine whether the defendant CRA used reasonable procedures. And, while not its ultimate burden, a defendant CRA always has an opportunity to show that it used procedures that are reasonable. Although this opportunity may rarely succeed in obtaining summary judgment, the opportunity lies within the statutory framework.

Despite the spectrum of circumstances, "[i]n the majority of cases, reasonableness is a question for the jury." *Id*. This is so because the reasonableness of the procedures is usually not clear enough to evoke a definitive answer one way or the other as a matter of law. In some circumstances, however, courts may, as a matter of law, characterize the reasonableness of the procedures used as either reasonable on one hand or unreasonable on the other. For instance, "reasonableness becomes a question of law if the facts are undisputed." *Continental Sav. Ass'n v. U.S. Fidelity*, 762 F.2d 1239, 1243 (5th Cir. 1985); *accord La. Generating, LLC v. Ill. Union Ins. Co.*, 831 F.3d 618, 634 n.48 (5th Cir. 2016).

This Court itself has recognized that even though accuracy is an element of an FCRA claim, a defendant CRA may "assert[] a defense that, while a particular entry may contain an inaccuracy under the prevailing law of a specific jurisdiction, such inaccuracy is not sufficient to impose liability on a credit reporting agency." *See Hurst*, 2021 WL 5926125, at *5. In other words, with respect to summary judgment:

> Once the plaintiff satisfies the initial burden to [show] that a credit report contains inaccurate information, the agency may still ultimately "escape liability" under § 1681e(b) "if it establishes that an inaccurate report was generated by following reasonable procedures, which will be a jury question in the overwhelming majority of cases."

*Id*. (quoting *Cahlin v. Gen. Motors Acceptance Corp.*, 936 F.2d 1151, 1156 (11th Cir. 1991)).

While agencies "must anticipate that its customers will make errors and develop backup or screening systems to weed these out to the extent possible," this does mean that such systems must catch all errors. *Anderson*, 345 F. Supp. 2d at 971. This is so because "the FCRA does not require unfailing accuracy from consumer reporting agencies." *Denan v. Trans Union LLC*, 959 F.3d 290, 294 (7th Cir. 2020).

Furthermore, as the Seventh Circuit has held, "as a matter of law, a credit reporting agency is not liable under the FCRA for reporting inaccurate information obtained from [a presumptively reliable source], absent prior notice from the consumer that the information may be inaccurate." *Id*. at 297 (quoting *Henson v. CSC Credit Servs.*, 29 F.3d 280, 285 (7th Cir. 1994)). "CRAs act reasonably when they rely on legal documents of unquestioned authenticity." *Chaitoff*, 2023 WL 5200125, at *7. With respect to inaccurate court records, the Seventh Circuit has explained:

> A contrary rule of law would require credit reporting agencies to go beyond the face of numerous court records to determine whether they correctly report the outcome of the underlying action. Such a rule would also require credit reporting agencies to engage in background research which would substantially increase the cost of their services. In turn, they would be forced to pass on the increased costs to their customers and ultimately to the individual consumer.
>
> Moreover, reliance on official court records is unlikely to lead to inaccurate credit reporting except in isolated instances. Requiring credit reporting agencies to look

> beyond the face of every court document to find the rare case when a document incorrectly reports the result of the underlying action would be unduly burdensome and inefficient. The consumer is in a better position than the credit reporting agency to detect errors appearing in court documents dealing with the consumer's own prior litigation history. Once the information is erroneously reported on the consumer's credit report, the consumer will be alerted to the error and can then seek correction of the error by notifying the credit reporting agency or the court itself. Absent such notice, however, the credit reporting agency may rely on the accuracy of public court documents in preparing a credit report without being subject to liability under the FCRA.

*Henson*, 29 F.3d at 285-86. Of course, the facts of this case differ from those in *Henson*. But as will be discussed later, the same or similar rationales may apply here.

Plaintiff moves for summary judgment on liability while maintaining that willfulness and damages should go to the jury. Defendant moves for summary judgment as a reseller who has more limited statutory obligations and who has fully complied with such obligations. It further moves for summary judgment on any claimed willfulness and asserts a purported defense as to any additional recovery by Plaintiff under a one satisfaction rule. The Court will first address that rule.

## A. One Satisfaction Rule

Invoking the "one satisfaction rule," Defendant argues that Plaintiff's claim "fails for lack of damages." ECF No. 107 at 15. It contends that TURSS compensated Plaintiff for his damages when those parties settled this case between them and that Plaintiff has not provided any "computation of any additional damages, let alone any computation that exceeds that prior recovery." *Id.*

The parties present conflicting caselaw for applying the "one satisfaction rule" to FCRA actions, *compare* ECF No. 107 at 15-16 *with* ECF No. 111 at 16-17, but the Court need not wade into that conflict at this point. In general, the rule "provides that a plaintiff is entitled to only one satisfaction for a single injury, such that amounts received in settlement from an alleged tortfeasor are credited against judgments for the same injury against non-settling tortfeasors." *BUC Int'l Corp. v. Int'l Yacht Council Ltd.*, 517 F.3d 1271, 1276 (11th Cir. 2008). It is thus not a defense that may prompt summary judgment on a claim. Instead, if applicable, it comes into play once a

party has obtained a judgment against a non-settling adverse party. This case has not progressed to that point.

Furthermore, although Defendant purports to rely on the "one satisfaction rule" for obtaining summary judgment on the FCRA claim asserted against it, its arguments appear to seek discovery sanctions under Fed. R. Civ. P. 37 for a perceived failure of Plaintiff to comply with Fed. R. Civ. P. 26(a)(1)(A)(iii). *See* ECF No. 107 at 16-17. If Defendant were to successfully exclude evidence of damages due to a failure to disclose, then it might rely on a demonstrated absence of evidence to carry its summary judgment burden. But Defendant does not seek to carry its summary judgment burden by pointing to an absence of evidence to support Plaintiff's alleged damages. It readily accepts that Plaintiff has evidence of damages, as shown by his settlement with TURSS. It argues that Plaintiff is not entitled to "double recovery" of the same damages and then goes into its allegations that Plaintiff has failed to comply with disclosure requirements. Its argument thus differs from what a party might argue after obtaining exclusion of evidence. There is no need on Defendant's motion to address exclusion of evidence of damages.

For these reasons, the Court declines to find that the one-satisfaction rule warrants summary judgment in any respect.

## B. Reseller Impact

From the outset of its motion, Defendant steadfastly contends that the fact that it is a reseller as defined in the FCRA limits its duties owed under 15 U.S.C. § 1681e(b). *See* ECF No. 107 at 1, 7. As characterized by Defendant, in contrast to an originating CRA, like TUBDS, Defendant is an intermediary that passes along information obtained from sources like TUBDS. *Id*. at 8. It bluntly contends that "TUBDS prepared the report at issue and is responsible for its accuracy." *Id*. at 1. It maintains that it has "fulfilled its statutorily specialized and limited role of accurately transmitting the information reported by TUBDS, and as a matter of law [it] was entitled to reasonably rely on the records it received from TUBDS." *Id*. It submits that, "as a reseller," it "applied its own

procedures to ensure that the record on its face was reportable, and [it] then accurately transmitted the civil court record data identified by TUBDS to Berkshire." *Id*. at 1-2. In short, it argues that it has fully complied with its reseller obligations. *See id*. at 9.

More specifically, Defendant argues: "Initially, under recent Fifth Circuit precedent, § 1681e(b) has no application to RentGrow under the undisputed facts. As a reseller, RentGrow did not 'prepare' the allegedly inaccurate report. TUBDS prepared that report. This case can end there." *Id*. at 2. The premise for this argument is *Walters v. Tenant Background Search*, 849 F. App'x 476 (5th Cir. 2021) (per curiam). *See id*. at 9-10. Second, it argues that "[e]ven if § 1681e(b) applied to [it], it fulfilled its obligations as a reseller by accurately reporting the public record information identified to it by TUBDS." *Id*. 2, 10-11. Third, it argues that it "is entitled to summary judgment because it was permitted to rely on TUBDS to provide accurate information, as TUBDS is indisputably obligated to do under the FCRA." *Id*. at 11.

The plain language of the FCRA does not support RentGrow's arguments that it has reduced obligations under 15 U.S.C. § 1681e(b). In this case, it is undisputed that RentGrow is a reseller under the FCRA. *See* ECF No. 111 at 1. The FCRA defines "reseller" as

> a consumer reporting agency that –
>
> (1) assembles and merges information contained in the database of another consumer reporting agency or multiple consumer reporting agencies concerning any consumer for purposes of furnishing such information to any third party, to the extent of such activities; and
>
> (2) does not maintain a database of the assembled or merged information from which new consumer reports are produced.

15 U.S.C. § 1681a(u).

By definition, a reseller is a type of CRA. Although resellers are a subset of CRAs, they remain subject to § 1681e(b). This is so, because § 1681e(b) imposes requirements on all CRAs without limitation as to a type of CRA. As set out earlier, § 1681e(b) states in full: "Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to

assure maximum possible accuracy of the information concerning the individual about whom the report relates." While this section contains multiple limitations, i.e., timing ("whenever"), action ("prepar[ing] a consumer report"), and subject matter ("concerning" certain individuals), the section does not limit itself to any type of CRA.

The fact that RentGrow is a reseller does not alter the applicability of § 1681e(b). The provision obligates all CRAs, resellers and otherwise, to follow reasonable procedures when preparing a consumer report. As discussed later, what constitutes a reasonable procedure for a reseller CRA versus an originating CRA may differ, but that is an entirely different matter. Nevertheless, as recognized by the Fifth Circuit, when a sued CRA does not prepare the relevant report, § 1681e(b) is not implicated as to that CRA, and courts may appropriately enter summary judgment for that CRA on a § 1681e(b) claim. *See Walters*, 849 F. App'x at 478. To the extent one can construe *Walters* or the litigation leading to it to mean that resellers are not subject to § 1681e(b), this Court respectfully disagrees. And, as an unpublished opinion, *Walters* is no more than persuasive authority. *See C.M. v. United States*, ___ F. Supp. 3d ___, ___, No. 5:21-CV-0234-JKP-ESC, 2023 WL 3261612, at *42 (W.D. Tex. May 4, 2023) (citing *Ballard v. Burton*, 444 F.3d 391, 401 n.7 (5th Cir. 2006)).

> There is nothing ambiguous about [§ 1681e(b)] and nothing in this provision indicates an intent to treat resellers any differently from all other consumer reporting agencies. Reading into § 1681e(b) an exception for resellers, and thus interpreting § 1681e(b) to exempt resellers from the requirement of having procedures in place to assure maximum possible *accuracy* of the information it provides, is objectively unreasonable and inconsistent with the clear and explicit statutory language.

*Rogue v. Corelogic Credco, LLC*, No. 1:19-CV-00260-BLW, 2020 WL 7061745, at *3 (D. Idaho Dec. 2, 2020). Despite the applicability of § 1681e(b) to resellers, the duty to follow the reasonable procedures required by § 1681e(b) does not arise until the CRA, reseller or not, "prepares a consumer report."

The initial focus is not on whether RentGrow is a reseller, but whether it prepared a

consumer report related to Plaintiff. Contrary to apparent arguments of RentGrow that a reseller merely "assembles and merges information," ECF No. 107 at 7, the definition of reseller does not preclude a reseller from preparing consumer reports within the meaning of § 1681e(b). Further, the FCRA broadly defines a "consumer report" as

> any written, oral, or other communication of any information by a consumer report-
> ing agency bearing on a consumer's credit worthiness, credit standing, credit ca-
> pacity, character, general reputation, personal characteristics, or mode of living
> which is used or expected to be used or collected in whole or in part for the purpose
> of serving as a factor in establishing the consumer's eligibility for [three broad pur-
> poses].

15 U.S.C. § 1681a(d).

Notably, in a prior action against RentGrow, the First Circuit addressed a § 1681e(b) claim without suggesting that the statute does not apply to a reseller like RentGrow. *See McIntyre v. RentGrow, Inc.*, 34 F.4th 87, 91-101 (1st Cir. 2022). Although the First Circuit did not use the term, "reseller," in making its rulings, it did state:

> RentGrow is a consumer reporting agency (CRA) that generates reports used by
> landlords and property managers to screen prospective tenants. The information
> contained in these tenant-screening reports includes summaries of public records of
> court proceedings involving each prospective tenant. RentGrow neither obtains nor
> reviews these court records itself but, rather, purchases reports synthesizing the
> court records from TransUnion Background Data Solutions (TUBDS), which is a
> subsidiary of TransUnion (one of the three largest CRAs in the United States).

*Id.* at 91. This aptly describes the reseller role of RentGrow in this action. Nothing in *McIntyre* indicates that RentGrow either argued or that the First Circuit considered that § 1681e(b) simply does not apply to resellers like RentGrow. And for good reason – there is no basis for such an argument based on the plain language of the statute.

RentGrow next argues that it merely resold information already prepared by TUBDS, and that this "alone is sufficient to grant summary judgment to [it]." ECF No. 107 at 10. But its own evidence reflects that it prepared a screening report from information provided by other sources, *see* Decl. Grinberg (Ex. L, ECF No. 102-11) ¶ 4. Even according to its expert, "RentGrow prepared

a tenant screening report using, in part, housing record information from a consumer report obtained from TUBDS." ECF No. 102-9 (Ex. J) at 14. The evidence does not show that RentGrow merely forwarded a report prepared by TUBDS or other CRA. RentGrow obtained information and prepared its own screening report based on the gathered information. Although RentGrow wants to avoid the applicability of § 1681e(b) to resellers, the tenant screening report it prepared is sufficient to invoke the requirements of § 1681e(b). It has not shown that § 1681e(b) is inapplicable to it. No one disputes that RentGrow is a CRA. And the unambiguous text of the § 1681e(b) makes the statute applicable to all CRAs.

Relatedly, RentGrow argues that it has complied with the reseller obligations under § 1681e(b) by accurately transmitting the information provided to it by TUBDS. ECF No. 107 at 10. While this argument goes to the reasonableness of RentGrow's procedures, which the Court addresses in the next section, its premise erroneously lies with resellers having different obligations under § 1681e(b). *See id*. 9-10. To the extent that RentGrow contends that its role as a reseller reduces or eliminates its obligations under § 1681e(b), the Court rejects that premise.

For all of these reasons, the Court finds that RentGrow's status as a reseller does not have the impact that RentGrow contends. Section 1681e(b) applies to resellers. RentGrow's obligations under that provision are neither limited nor changed by its status as a reseller. All CRAs, even those who qualify as a reseller, are obliged to use reasonable procedures to assure the maximum accuracy of information when they prepare a consumer report. This is not to say that the type of CRA cannot impact the reasonableness of the procedures used. But that differs materially from contending that § 1681e(b) either does not apply to resellers or that the provision's obligation to use reasonable procedures differs when the CRA is a reseller. While the obligation is the same for all CRAs, what constitutes reasonable procedures for a reseller may differ from what is reasonable for an originating CRA. The Court thus proceeds to the crux of the motions for summary judgment – whether RentGrow used reasonable procedures as required by § 1681e(b) when it prepared the

consumer report about Plaintiff. And the fact that RentGrow is a reseller CRA is part of the totality of circumstances that courts may consider when considering whether procedures are reasonable.

## C. Reasonableness Analysis

With respect to the reasonableness of its procedures, RentGrow seeks summary judgment on grounds that it employs reasonable procedures by (1) accurately transmitting information provided to it by a third-party vendor such as TUBDS and (2) relying on TUBDS to provide accurate information. *See* ECF No. 107 at 10-11. Plaintiff seeks summary judgment because RentGrow has produced no evidence that its blind reliance on TUBDS satisfies its duty to maintain reasonable procedures. ECF No. 100 at 6. Alternatively, he contends that the record can support finding Rent-Grow's procedures are unreasonable. *Id.* at 13.

Naturally, each movant has a summary judgment burden to satisfy. But the summary judgment burden depends on which party has the ultimate burden of proof. To the extent reasonableness is part of Plaintiff's case in chief, as supported by Fifth Circuit precedent, *see Sepulvado v. CSC Credit Servs., Inc.*, 158 F.3d 890, 896 (5th Cir. 1998), Plaintiff, as a summary judgment movant, cannot rely on an absence of evidence as to the reasonableness of RentGrow's procedures. But for RentGrow to affirmatively rely on the reasonableness of its procedures to escape liability at the summary judgment stage, it has the summary judgment burden to show that there is no genuine dispute of material fact as to the reasonableness of its procedures. Once the summary judgment movant meets its burden, "the nonmovant bears the burden of adducing evidence showing an issue of fact that is more than colorable." *McIntyre v. RentGrow, Inc.*, 34 F.4th 87, 94 (1st Cir. 2022) (citation and internal quotation marks omitted).

Plaintiff first argues that RentGrow has presented no evidence that its blind reliance on information provided by another CRA satisfies its duty to maintain reasonable procedures. ECF No. 100 at 6. But this argument misses the point to the extent Plaintiff has the burden on the reasonableness issue. In such circumstances, RentGrow has no obligation to produce evidence to

avoid liability on summary judgment. While a summary judgment movant may point to an absence of evidence to carry its summary judgment burden, that avenue is only available when the movant does not have the ultimate burden on the claim for which summary judgment is sought. Thus, because that ultimate burden lies with Plaintiff, he must provide evidence that the procedures of RentGrow are unreasonable as a matter of law to be entitled to summary judgment on the FCRA claim in this case.

Plaintiff next argues that the record can support finding RentGrow's procedures to be unreasonable. *Id*. at 13. However, that the record can support such a finding does not mean that the record supports such a finding as a matter of law. As discussed in more depth later, the nature of the inaccuracy in this case is not of itself sufficient to hold that RentGrow used procedures that are unreasonable as a matter of law. Viewing the evidence in the light most favorable to RentGrow, the Court finds that a reasonable jury could return a verdict in favor of RentGrow. And, even if Plaintiff provided enough evidence to shift the burden to RentGrow to escape liability based on use of reasonable procedures, RentGrow has provided enough evidence to survive Plaintiff's motion for summary judgment.

Further, because RentGrow has moved for summary judgment based on the reasonableness of its procedures, the crucial question at this point, is whether it has provided enough evidence to find its procedures reasonable as a matter of law. Defendant makes three arguments for how it has fully complied with its obligations under § 1681e(b): (1) it did not "prepare" a consumer report for purposes of § 1681e(b); (2) it accurately communicated the data reported by TUBDS; and (3) it reasonably relied on reputable and trustworthy sources of information. ECF No. 107 at 9. The Court addressed the first argument in the prior section, dispelled it as a viable avenue for summary judgment, and will not revisit it here.

The Court has also rejected the second argument to the extent Defendant premised it on altering the obligations owed to consumers by resellers. It now addresses the argument in the

context of the reasonableness of Defendant's procedures. With respect to the reasonableness of its procedures, Defendant essentially argues that reasonable procedures only require a reseller to accurately transmit the information provided to it by a third-party vendor such as TUBDS. *Id*. at 10 (relying on *Baker v. Experian Info. Sols., Inc.*, No. SA-CV-14-1011-AG-ANX, 2015 WL 4603080 (C.D. Cal. June 22, 2015)).

Because Defendant relies greatly on *Baker*, the Court reviews that case in additional detail. Notably, *Baker* specifically based its decision on a lack of any genuine dispute "of material fact concerning the reasonableness of [the defendant's procedures]." 2015 WL 4603080 at *1, 4. That, of course, indicates that the *Baker* court did not view § 1681e(b) as inapplicable to resellers. Instead, *Baker* applied § 1681e(b) to a reseller and found that when a reseller "takes the information it receives and passes it to the party that requests the information" without "add[ing] any information," such "procedures were reasonable as a matter of law." *Id*. at *5. From that description, *Baker* sounds much like *Walters* where the reseller simply forwarded a report prepared by a different CRA. But, by applying § 1681e(b), the *Baker* court necessarily viewed the reseller as having prepared a consumer report thus invoking review of the reasonableness of its procedures.

The only case on Westlaw that cites *Baker* begins with the unremarkable conclusions that resellers are consumer reporting agencies as defined by the FCRA and that resellers are not "to be treated differently from other consumer reporting agencies" under § 1681e(b). *See Rogue v. Corelogic Credco, LLC*, No. 1:19-CV-00260-BLW, 2020 WL 7061745, at *2-3 (D. Idaho Dec. 2, 2020). It then distinguishes *Baker* on grounds that the reported information in *Baker* did "not by its existence show inaccuracy." *Id*. at *3 (recognizing that unlike *Baker*'s reported information, "there was a potential inaccuracy" in the information reported in its case because the information only showed on one of three national CRA reports). While *Rogue* distinguished *Baker* on that basis, both cases actually involve information showing on one national report while being missing on another. *Compare id*. at 3 *with Baker*, 2015 WL 4603080, at *2 (recognizing that "[t]he

Experian report contains student loans not listed on the TransUnion and Equifax reports").

As recognized by *Baker*, it is unusual for FCRA actions to proceed to summary judgment. *See* 2015 WL 4603080, at *1. Further, because "[t]he FCRA does not impose strict liability," a CRA may "escape liability if it establishes that an inaccurate report was generated despite the agency's following reasonable procedures." *Id*. at *4. And while "[t]he reasonableness of the procedures and whether the agency followed them will be a jury question in the overwhelming majority of cases," the court found that the undisputed facts warranted summary judgment as a matter of law. *Id*.

This Court has no disagreement with these principles of law. It further agrees that the reasonableness issue of § 1681e(b) is fact intensive. But to the extent Defendant here suggests that the *Baker* decision dictates the same finding of reasonableness as a matter of law, the Court disagrees. First, the case is not binding precedent and the Court declines to find that procedures of a reseller are reasonable as a matter of law simply because the reseller accurately transmits information provided to it. To properly evaluate the reasonableness of a CRAs procedures requires consideration of the totality of circumstances. That some facts or circumstances overlap does not dictate the same outcome when other facts and circumstances exist. And as discussed more fully below, the fact that the inaccuracy was not apparent to the reseller is only part of the reasonableness inquiry.

Although the case now before the Court does not reveal discrepancies between reports of national CRAs as present in *Rogue* and *Baker*, this Court still agrees with the persuasive analysis in *Rogue*, which recognized that "other district courts have repeatedly rejected . . . resellers' arguments that a reseller is only required to accurately reproduce the information furnished to it by other credit bureaus." 2020 WL 7061745, at *4. *Rogue* further noted that "courts have, instead, found that, as a matter of law, a reseller can be subject to liability under § 1681e(b) for failing to follow reasonable procedures to assure the maximum possible accuracy of the information it

provides on a consumer." *Id*. (citing cases). Reasonableness of procedures is not merely dependent on a reseller passing along information unchanged after receipt from other CRAs. This Court flatly rejects the notion that a CRA uses reasonable procedures in preparing a credit report when it knows or should know that it is passing along inaccurate information even when it passes along information unchanged after receipt from another CRA.

In addition, the Court finds that RentGrow in this case did more than merely pass along information to Berkshire that RentGrow had received from a different CRA. While Plaintiff contends that RentGrow added "judgment of possession" to the information provided by TUBDS – a contention that is unsupported by the record – RentGrow did include a notation of "Possession," which goes beyond the information provided. This added information differs from the circumstances in *Baker*.

Standing alone, accurately passing information along from a different CRA is insufficient to establish the procedures of the reseller CRA to be reasonable as a matter of law. Even *Baker* required more than simply passing along information accurately. *See* 2015 WL 4603080, at *5. It is also important that the reseller "not add any information." *Id*. *Baker*, furthermore, specifically points out that it did not involve circumstances where reports show contradictory information. *Id*. The court's reasoning was further "influenced by the fact that Defendant acts an intermediary role . . . and that the FCRA does 'not impose strict liability." *Id*.

RentGrow places much reliance on *Baker* because it views the same influencing factors that convinced the *Baker* court to find the reseller's procedures reasonable as a matter of law present here. There is no doubt that both here and in *Baker*, the FCRA did not impose strict liability. Also, the inaccuracy here is not internally inconsistent with or contradictory to other provided information. But viewing the facts in the light most favorable to Plaintiff, the facts here show that RentGrow did more than just pass along information it had received from TUBDS. It added a notation regarding "Possession" that is not within the provided information. It supplemented the

provided information and included the information in its own tenant screening report. Viewed in the light most favorable to Plaintiff, RentGrow acted more than as an intermediary.

In any event, the reasonableness of procedures is viewed under a totality of the circumstances. Additional circumstances must be factored into the analysis. This Court thus declines to consider *Baker* in isolation from other facts in this case. And it will not further separately consider RentGrow's second argument, which focuses on accurately transmitting data reported to Rent-Grow by TUBDS, from its third argument, which focuses on the reliability of its sources. As analyzed next, accurately transmitting reported data is insufficient without receiving it from a reliable and trustworthy source. The Court thus proceeds to Defendant's third argument, which also goes directly to the reasonableness of Defendant's procedures.

The following facts are not in dispute. An apartment complex reached out to RentGrow for information on a prospective tenant. RentGrow in turn reached out to a national consumer reporting agency ("NCRA"). That national agency relied on LexisNexis to obtain information about civil actions involving Plaintiff. The provided information showed a forcible detainer action against Plaintiff. From that information, RentGrow prepared its own tenant screening report that noted "Possession" but did not specify any judgment against Plaintiff or use the term evicted.

The information provided to RentGrow and then incorporated into its tenant screening report is not patently incorrect. It does not contradict other information known to RentGrow and provided in its screening report. There is no internal inconsistency within the screening report. But the provided information is misleading such that it can be expected to adversely affect a credit decision. This type of inaccuracy does not of itself show that RentGrow failed to use reasonable procedures. Nor does it of itself show a genuine dispute of material fact as to the reasonableness of the used procedures.

With its response to Plaintiff's summary judgment motion, RentGrow provides evidence that it employs the following procedures to assure the accuracy of the data it resells: (1) contracting

with TUBDS to supply RentGrow with civil court record information; (2) selecting "TUBDS as its public record provider after considering the offerings of other providers and testing samples of those providers' proffered data against the data provided by TUBDS; (3) after completing "that vetting and selection process," concluding "that TUBDS's data was reliable and complete and the best available in the marketplace"; (4) executing contracts with TUBDS that require "TUBDS to, among other actions, 'obtain[n] [sic] and assembl[e] [consumer information] from sources [TUBDS] considers reliable"; (5) developing proprietary processes to ensure the accurate mapping of the data reported by TUBDS to a standardized format; and (6) dispute monitoring and processing. *See* Decl. Grinberg (ECF No. 113-1, Ex. A) ¶¶ 5-9, 12. The declarant also states:

> Less than 2% of civil screenings that include TUBDS records are the subject of a consumer dispute that results in the disputed record being deleted or updated after reinvestigation by TUBDS, and less than 1% are subject to a dispute that results in any change to the applicant's leasing recommendation based on the housing provider's eligibility criteria.

*Id*. ¶ 12.

But RentGrow does not provide evidence that it has developed any backup or screening systems to weed out potential errors in information provided to it. It provides no evidence that it spot-checks received consumer reports or otherwise reviews provided information. Absence of these important facts can doom a CRA's efforts to show that its procedures are reasonable as a matter of law. Despite a lack of evidence on these matters, RentGrow expressly relies on the source of its information, which it characterizes as reputable, trustworthy, and indisputably obligated to use its own reasonable procedures to assure the maximum accuracy of reported information.

The Seventh Circuit recognizes that a CRA may rely on information from a presumptively reliable source without violating § 1681e(b), so long as the consumer has not notified the CRA that the information may be inaccurate. *Denan v. Trans Union LLC*, 959 F.3d 290, 297 (7th Cir. 2020); *Sarver v. Experian Info. Sols.*, 390 F.3d 969, 972 (7th Cir. 2004) ("records from financial institutions"); *Henson v. CSC Credit Servs.*, 29 F.3d 280, 285 (7th Cir. 1994) (court records).

Similarly, the Sixth and Tenth Circuits have found that CRAs may reasonably rely "on information gathered by outside entities . . . so long as the information is not 'obtained from a source that was known to be unreliable' and is 'not inaccurate on its face' or otherwise 'inconsistent with information the [credit reporting agencies] already had on file.'" *Hammoud v. Equifax Info. Servs., LLC*, 52 F.4th 669, 675 (6th Cir. 2022) (quoting *Wright v. Experian Info. Sols., Inc.*, 805 F.3d 1232, 1241 (10th Cir. 2015)). Importantly, "the Fair Credit Reporting Act requires only that the procedures adopted by credit-reporting agencies be 'reasonable' in relation to the goal of accurate credit reporting." *Childress v. Experian Info. Sols., Inc.*, 790 F.3d 745, 747 (7th Cir. 2015).

From these cases, it is apparent that RentGrow must lack notice of the inaccuracy of the information it provided regarding Plaintiff. Although this notice is not a requirement of § 1681e(b), notice or its absence is relevant to whether CRA defendants have "followed reasonable procedures" or "shown that their procedures were otherwise reasonable as a matter of law." *Starkey v. Experian Info. Sols., Inc.*, 32 F. Supp. 3d 1105, 1110 (C.D. Cal. 2014). Reliance on even a trustworthy source does not constitute using a reasonable procedure if the receiving CRA has notice of an inaccuracy and still includes it in a consumer report.

The evidence here shows that Plaintiff alerted Berkshire of a potential issue with a prior apartment rental, but there is no evidence that he alerted RentGrow of any potential inaccuracy prior to RentGrow submitting its tenant screening report to Berkshire. Still, the relevancy of notice goes to the reasonableness or unreasonableness of procedures used. It is patently unreasonable to rely on even a presumptively reliable source if the CRA has notice of a material inaccuracy regardless of who or what provided such notice. In other words, if a CRA has notice of a material inaccuracy and includes it in a credit report, the CRA cannot simply rely on the reliability of its source. Notice directly from the consumer is but one basis for having notice.

This case does not involve an inaccurate court record per se. The court record itself actually shows that the forcible detainer action was dismissed in Plaintiff's favor. The inaccuracy in this

case is the misleading nature of the information provided to RentGrow and then incorporated into its tenant screening report with an additional notation of "Possession." While some inaccuracies by their very nature may provide notice, the inaccuracy in this case does not suffice for such notice as a matter of law. Looking to various cases which declined to find that a reseller CRA complied with § 1681e(b) as a matter of law, the Court finds inaccuracies in the prepared consumer report of the reseller that provide enough notice that the CRA cannot merely rely on information provided even from a reputable national credit reporting agency.

For example, although this Court has found *Rogue* to be persuasive for rejecting the argument that a reseller CRA must only accurately merge and assemble information provided from NCRAs to fulfill its obligations under § 1681e(b), the potential inaccuracy at issue in *Rogue* resulted from "information regarding a bankruptcy contained on only one NCRA's report . . . that was not included on the other two NCRA's reports." 2020 WL 7061745, at *3. Such a potential inaccuracy differs materially from the one at issue here.

Similarly, another court has found that a consumer report showing that the plaintiff "was deceased yet his bills were paid on time" was "internally contradictory and demonstrated an inaccuracy" that showed a genuine dispute as to material fact as to the reasonableness of the CRA's procedure of relying on information from other CRAs. *See Perez v. Trans Union, LLC*, 526 F. Supp. 2d 504, 509 (E.D. Pa. 2007), *abrogated on other grounds by Cortez v. Trans Union, LLC*, 617 F.3d 688 (3d Cir. 2010). Likewise, an internal inconsistency within a reseller's consumer report that the plaintiff has birthyears in both 1938 (which actually belonged to the plaintiff's grandmother) and 1987 (her actual birthyear) warrants denying summary judgment to the CRA because the inaccuracy "raise[s] a fact question as to whether [the CRA] acted reasonably pursuant to Section 1681e(b) of the FCRA in generating [the plaintiff's] credit reports". *See Ocasio v. CoreLogic Credco, LLC*, No. CV 14-1585 (NLH/JS), 2015 WL 5722828, at *1, 4 (D.N.J. Sept. 29, 2015). The consumer report in the present case does not include an internal inconsistency.

While the above types of inaccuracies may reveal a failure to follow reasonable procedures, this case does not present any such inaccuracy. This case does not present an inaccuracy that is internally inconsistent with other reported information. Nor does this case present contradictory information within the relevant consumer report. The information provided by TUBDS about the forcible detainer action against Plaintiff lacks a disposition or date of disposition even though the information shows that the case had been filed more than four years before TUBDS provided the information. The provided information also fails to identify any prevailing party. But the provided information does not present facially inaccurate information. The nature of the inaccuracy in this case does not of itself show a failure to follow reasonable procedures.

Additionally, much of the rationale set out long ago in *Henson* appears equally pertinent in the instant context. As is the case with court records, requiring CRAs to go beyond the face of information provided from another CRA, like TUBDS, to determine whether the information is correctly reported would require CRAs to duplicate efforts that the original CRA is required to undertake. Requiring such duplication of effort would substantially increase the cost of services which would be passed on to their customers and ultimately to consumers. Not only are such duplicate efforts unlikely to lead to the discovery of inaccurate information except in rare instances, but they are unduly burdensome and inefficient. Thus, like court records, CRAs may rely on the accuracy of information obtained from a reputable source so long as the reporting CRA has no notice that the information is inaccurate.

If RentGrow obtained the reported information from a known reputable source, or at least one that is not known to be unreliable, its procedures might be reasonable as a matter of law. But a prior case involving RentGrow provides persuasive analysis for denying summary judgment on the reasonableness issue. *See McIntyre v. RentGrow, Inc.*, 34 F.4th 87, 97-98 (1st Cir. 2022). The First Circuit first concluded that the district court had not erred "in concluding that the question of whether [the relevant consumer] report" prepared by RentGrow "contained materially inaccurate

information was for the jury." *Id.* at 97. It then proceeded to consider whether RentGrow had

complied with reasonable procedures:

> We next ask whether a jury could find that RentGrow failed to follow reasonable
> procedures for assuring the maximum possible accuracy of the information in-
> cluded in its reports. It is undisputed that RentGrow relied on TUBDS's reporting
> and did not itself review civil court filings, dockets, or other court records. The fact
> that a CRA relies on a third-party vendor to furnish court-records information does
> not automatically render its procedures unreasonable as a means of assuring the
> maximum possible accuracy of the information in its reports. In the context of such
> a third-party vendor relationship, the question is what the record shows about the
> reasonableness of the procedures that the CRA implemented to assure the maxi-
> mum possible accuracy of the vendor-sourced information included in its reports.
>
> Here, a jury could find that RentGrow failed to implement reasonable procedures
> to assure maximum possible accuracy. Although RentGrow did engage in an ad hoc
> filtering process, it did not have procedures in place to verify whether the court-
> records information it received from TUBDS was either correct or complete. Nor
> did it independently spot-check or otherwise review the underlying dockets.
>
> A jury could evaluate RentGrow's handling of this aspect of its business in light of
> facts sufficient to support an inference that RentGrow knew or should have known
> that TUBDS's data was not presumptively reliable. For one thing, RentGrow's re-
> liance on TUBDS for court-records information resulted in a not insignificant num-
> ber of disputes over a two-year period (from October of 2016 through October of
> 2018): 6,194 disputes out of 272,893 tenant-screening reports containing court-rec-
> ords information. This means that roughly 2.3 percent of the reports were disputed
> — and many of those disputes appear to have been successful in securing correc-
> tions. Of 2,953 disputes containing eviction-litigation records (a subset of court-
> records information), 2,526 resulted in corrections of some sort.
>
> For another thing, industry trends suggested that TUBDS's court-records infor-
> mation might not be presumptively reliable. Following a 2015 settlement with over
> thirty state Attorneys General that required TransUnion (TUBDS's parent com-
> pany) and other large CRAs to adhere to stipulated accuracy standards for the re-
> porting of certain information, TransUnion for the most part stopped reporting civil
> court judgments in credit reports to end-users. *See* Consumer Fin. Prot. Bur., Quar-
> terly Consumer Credit Trends: Public Records, at 3-4 (February 2018) ("The most
> significant changes were observed for civil judgments. They had been the most
> common public record prior to July 2017, but after the [program required by the
> settlement] they disappeared entirely."); *see also* Settlement Agreement, In re In-
> vestigation by Eric T. Schneiderman, Attorney General of the State of New York,
> of Experian Information Solutions, Inc., et al. (March 8, 2015). But TransUnion
> continued to make this information available, through TUBDS, to intermediary
> CRAs like RentGrow. Here, moreover, the record (including the testimony of Rent-
> Grow's corporate representative) indicates that RentGrow continued to purchase
> civil court records from TUBDS while remaining largely unaware of both the pro-
> cesses by which TUBDS collected those records and the procedures that TUBDS

used to update records and verify their accuracy.

*Id*. at 97-98. Although the First Circuit also considered evidence that RentGrow was not "indifferent to its reported information," as shown by evidence that "RentGrow took care to select the court-records provider that it deemed best," the First Circuit ultimately concluded that "the evidence as to the reasonableness of RentGrow's procedures to assure maximum possible accuracy was conflicting, and thus, presented a question of fact for the jury." *Id*. at 99.

While information from a fellow CRA may not be as trustworthy as court records, all CRAs are obligated to comply with § 1681e(b). Whether it is presumptively reasonable to rely on information obtained from any other CRA need not be decided here. But RentGrow has provided evidence that it may be presumptively reasonable to rely on information from a reputable, highly regulated source such as TUBDS, a subsidiary to TransUnion, LLC, one of three national credit bureaus. RentGrow has provided an expert opinion that its "reliance on TUBDS, itself a prominent player in the public records space, was consistent with industry standards, best practices, and Rent-Grow's acknowledged reseller role." ECF No. 102-9 at 16. From the evidence provided by Rent-Grow, both TUBDS and the source of its information, LexisNexis, could be considered to be well-established, well-known, and reliable industry sources of information. *See id*.

However, RentGrow's expert opinion appears contrary to express findings in *McIntyre*. Plaintiff, moreover, presents summary judgment evidence to counter the reasonableness of Rent-Grow's procedures.

Plaintiff presents deposition testimony that Defendant relies on TUBDS "to uphold their responsibilities to the FCRA in their maintaining of their records." Dep. Grinberg (ECF No. 100-09 (redacted); ECF No. 101-07 (unredacted)) 55:7-9. The deponent gave that answer as a corporate representative of RentGrow in response to a question about RentGrow vetting information received from TUBDS. *See id*. 55:2-5. Defendant also "ha[s] no knowledge of [TUBDS'] procedures" for assuring maximum possible accuracy. *Id*. 65:23-25. It does not "know what rules

[TUBDS has] in place for th[eir] third-party vendors to make sure the information is complete and accurate." *Id*. 66:1-4. It relies on TUBDS to uphold their obligations and believes TUBDS is reliable. *Id*. 66:5-12. It has "a dispute process to follow as part of [its] maximum possible accuracy responsibilities." *Id*. 66:13-17. It does not know the identities of the third-party vendors that TUBDS uses to obtain information. *Id*. 75:2-5. It does not know anything about TUBDS' reliability. *See id*. 75:6-8. Unless a consumer submits a dispute, RentGrow has no way to know whether something was potentially inaccurate. *Id*. 76:1-5. Based on its procedures, RentGrow would "have no reason for believing [reported information is] inaccurate" without the consumer reporting it. *Id*. 76:6-11. It testified that about five percent of reports result in a dispute. *Id*. 76:20-25.

Plaintiff presents testimony that Defendant views its § 1681e(b) obligation to assure maximum accuracy as requiring "that the record is reportable, that the report is complete, that it hasn't been dismissed, that it's not older than seven years." *Id*. 56:13-17. Defendant uses an automated filtering algorithm to examine submitted information to determine whether it meets those requirements. *Id*. 57:4-15. Before Defendant reports a record, its software reviews it for compliance with those things. *Id*. 35:2-10. Only in "rare instances" does a human actually review "the record for any inconsistent or nonreportable information." *Id*. 35:11-16. Even in these rare instances of human review, the reviewer merely examines the information provided by TUBDS – reviewers do not compare the information to the public record. *Id*. 35:17-36. When a consumer disputes a record, RentGrow sends it back to TUBDS. *Id*. 36:2-6.

Although the facts here may not be completely on all fours with *McIntyre*, the Court finds that, even if RentGrow has presented enough evidence that its procedures are reasonable to shift the burden to Plaintiff to present some evidence to create a genuine dispute of material fact, Plaintiff has met that shifted burden. Under the facts here, the Court cannot say that no reasonable jury could return a verdict in favor of Plaintiff. Stated more directly, on the facts here, summary judgment on the reasonableness issue is unwarranted because a reasonable jury could find that

RentGrow failed to follow reasonable procedures when it prepared the consumer report for Berkshire. Reviewing the summary judgment evidence in a light most favorable to the non-movant, the Court finds that the question of reasonableness of RentGrow's procedures is a jury question.

Reliance on TUBDS or another third-party vendor does not automatically render a CRA's procedures unreasonable. *McIntyre*, 34 F.4th at 97. Courts consider the totality of the circumstances when considering whether a CRA's procedures are reasonable. And courts may decline to find that a reseller like RentGrow followed reasonable procedures as required by § 1681e(b) when it "was 'largely unaware of the procedures [TUBDS] uses to collect data' and did not itself review civil court filings." *See id.* at 93-94. The reasonableness of a CRA's procedures depends on many factors. The nature of the inaccuracy is undoubtedly relevant. Knowing and understanding how a third-party vendor collects the data is relevant to the vendor's trustworthiness. To rely on a presumptively trustworthy source of information, a CRA must lack notice of the inaccurate information and have procedures in place to ascertain the trustworthiness of the source. Notice of the inaccurate information eliminates the reasonableness of relying on even a normally trustworthy source. And it may be unreasonable to rely on a third-party without procedures to ascertain the trustworthiness of the source, such as spot-checking information.

Based on the presented facts and summary judgment burdens, the Court denies both parties' motions for summary judgment on the issue of reasonableness of procedures. This means that Plaintiff's negligent claim under 15 U.S.C. § 1681e(b) will proceed to trial. Whether Plaintiff's willfulness claim under that provision proceeds to trial depends on the Court's rulings in the next section.

### D. Willfulness

Plaintiff does not move for summary judgment on his willfulness claim. *See* ECF No. 100 at 20. Defendant, however, seeks summary judgment on this claim based on a high bar for willfulness established by Supreme Court precedent. *See* ECF No. 107 at 13-15.

Section 1681n(a) provides for civil liability against "[a]ny person who willfully fails to comply with any requirement imposed under [Subchapter III of Chapter 41 of Title 15 of the United States Code] with respect to any consumer." "Willfulness under the FCRA is generally a question of fact for the jury." *Taylor v. First Advantage Background Servs. Corp.*, 207 F. Supp. 3d 1095, 1112 (N.D. Cal. 2016).

Section 1681n(a) permits punitive damages "even without malice or evil motive, but the violation must have been willful." *Pinner v. Schmidt*, 805 F.2d 1258, 1263 (5th Cir. 1986). The Fifth Circuit has recognized that willfulness means many things with "its construction often influenced by its context." *Id*. But because there was "simply nothing to even suggest that [defendants] willfully set out to do [the plaintiff] harm" and there was "no evidence that they knowingly and intentionally committed an act in conscious disregard for the rights of others," the court vacated the punitive damage award. *Id*.

The Supreme Court likewise recognizes that "'willfully' is a 'word of many meanings whose construction is often dependent on the context in which it appears.'" *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57 (2007) (quoting *Bryan v. United States*, 524 U.S. 184, 191 (1998)). It further recognizes that "where willfulness is a statutory condition of civil liability," it generally covers "not only knowing violations of a standard, but reckless ones as well." *Id*. In the civil context, "the phrase 'willfully fails to comply' in § 1681n(a)" includes "reckless FCRA violations." *Id*. And finally, it recognizes that "the term recklessness is not self-defining," but it is "generally understood . . . in the sphere of civil liability as conduct violating an objective standard: action entailing 'an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" *Id*. (quoting *Farmer v. Brennan*, 511 U.S. 825, 836 (1994)).

The Supreme Court thus held that "a company subject to FCRA does not act in reckless disregard of it unless the action is not only a violation under a reasonable reading of the statute's terms, but shows that the company ran a risk of violating the law substantially greater than the risk

associated with a reading that was merely careless." 551 U.S. at 69. It also provided insight into what circumstances support finding an objectively unreasonable interpretation of the FCRA. First, the statutory text must be "less-than-pellucid," thus giving rise to an objectively reasonable yet erroneous interpretation. *See id*. at 70. Also, there must be a lack of guidance from the appellate courts or the Federal Trade Commission ("FTC") that might have warned against the erroneous interpretation. *Id*.

Here, unlike the plaintiffs in *Safeco* and *McIntyre*, Plaintiff does not limit his claim to a reckless failure to comply with § 1681e(b). He claims that RentGrow willfully, intentionally, recklessly, and negligently violated § 1681e(b). Negligence is not at issue at this point. But the three others each fall within the scope of Plaintiff's willful noncompliance claim.

As the summary judgment movant on the willful noncompliance claim, RentGrow has the initial burden to show the basis for its motion. Because Plaintiff has the ultimate burden on this claim, RentGrow can carry its burden by pointing to an absence of evidence to support specific elements of Plaintiff's claim, in this instance the willfulness element. Here, RentGrow asserts the following bases for being entitled to summary judgment on the willfulness claim:

> (1) Plaintiff has not satisfied the high bar for a willfulness claim as set out in *Safeco*, including (a) RentGrow's "reasonable reliance on TUBDS to transmit accurate information was consistent with its defined statutory role as a reseller and industry standards," (b) there is a lack of Fifth Circuit or official regulatory guidance that aligns with Plaintiff's position as to the role of resellers, and (c) "the plain text of the FCRA, including §§ 1681a(f), 1681a(u) and 1681(f), all favor [its] interpretative position." *See* ECF No. 107 at 13-14.

> (2) "At the very least, Plaintiff's position that RentGrow was required to second guess the accuracy of the TUBDS data is not remotely 'pellucid' in his favor." *Id*. at 14.

> (3) "Plaintiff cannot identify guidance from the FTC, Fifth Circuit, or other courts of appeals that RentGrow's procedures to accurately transmit the data provided to it by TUBDS were willfully unreasonable." *Id*.

> (4) "[T]he only reseller case from the Fifth Circuit expressly rejects an attempted § 1681e(b) claim against a reseller like RentGrow." *Id*. (citing *Walters v. Tenant Background Search*, 849 F. App'x 476, 478 (5th Cir. 2021) (per curiam)).

33

(5) "[T]he standard role of a reseller in the consumer reporting industry is to act as an intermediary that assembles and transmits consumer report information from other CRAs to an end user, as RentGrow indisputably does. Resellers do not, as a standard practice, second guess the accuracy of the data provide to them by the originating CRA." *Id*. at 14-15 (citations omitted).

(6) "RentGrow's compliance with industry standards further belies any claim of a willful violation of the FCRA." *Id*. at 15.

(7) "Plaintiff also has no evidence that RentGrow acted in the face of any perceived risk of the violation of the law, including when RentGrow acted in conformance with industry standards in every way." *Id*.

Only the last listed basis asserts an absence of evidence. But that basis only goes to whether Defendant violated § 1681e(a) in reckless disregard of the statute. Plaintiff's willful noncompliance claim goes beyond recklessness. In response to Defendant's motion, Plaintiff points to "the Consumer Financial Protection Bureau ("CFPB") issued guidance addressing the grossly deficient procedures CRAs had been using to collect and report public records." ECF No. 111 at 15 (citing ECF No. 100-18 (pp. 10-11)). The First Circuit has persuasively rejected this as authoritative guidance that would have put RentGrow on notice that its procedures were unreasonable and not in compliance with § 1681e(b). *See McIntyre v. RentGrow, Inc.*, 34 F.4th 87, 100-01 (1st Cir. 2022). Because Plaintiff here has presented other evidence, this Court has no need to definitively reject it as well.

Plaintiff also points to the district court and appellate decisions in *McIntyre* as guidance. ECF No. 111 at 15. RentGrow summarily rejects such guidance on grounds that the First Circuit affirmed a grant of summary judgment on the willfulness claim. *See* ECF No. 121 at 9 n.9. That rejection ignores the fact that, in *McIntyre*, the plaintiff based her appeal on the willfulness claim entirely on the CFPB. *See* 34 F.4th at 101. Since May 13, 2022, RentGrow would have had the guidance of the *McIntyre* appellate decision. And since at least July 22, 2021, RentGrow would have had the guidance of the district court opinion. *See McIntyre v. RentGrow, Inc.*, No. 18-CV-12141-ADB, 2021 WL 3661499 (D. Mass. July 22, 2021), *aff'd*, 34 F.4th 87 (1st Cir. 2022). The

events leading to this litigation occurred in October 2021, after the district court decision in *McIn-tyre*, but before the appellate affirmance.

"As further evidence that RentGrow knew or should have known that TUBDS was not a presumptively reliable source of information," Plaintiff points to discovery in *McIntyre* that the appellate decision found to be undisputed information:

> (1) TUBDS returned civil court records for use in 380,559 tenant screenings con-ducted by RentGrow between October 12, 2016 and October 12, 2018; (2) after applying its filtering process, RentGrow reported civil court records in 272,893 ten-ant-screening reports; (3) consumers disputed reports in 6,194 screenings involving civil court records generally (approximately 2.3 percent), and 2,953 of those dis-putes (approximately 1.1 percent) concerned eviction records specifically; (4) With respect to the disputes concerning eviction records, 2,526 (approximately 85 per-cent) resulted in updates to the tenant-screening reports.

ECF No. 111 at 15 (purporting to quote *McIntyre*, 34 F.4th at 93).

While this evidence utilized in a prior case against RentGrow does not equate to federal appellate guidance or authoritative guidance from a relevant regulatory agency noted in *Safeco*, *see* 551 U.S. at 70, it goes directly to information known to a participant of such prior litigation. It goes directly to RentGrow's knowledge of the reliability of information provided by TUBDS. It goes directly to its knowledge of the trustworthiness of its source of information. Such information is directly relevant to RentGrow's position that its procedures reasonably permit it to rely on TUBDS to provide accurate information. And, as noted more than once already, Plaintiff does not limit its willful noncompliance claim to recklessly disregarding § 1681e(a).

"Surviving summary judgment on recklessness requires the record to show sufficient facts to make it obvious to a CRA that, under the totality of the circumstances, there was an unjustifiably high risk that the CRA was not following reasonable procedures to assure maximum possible ac-curacy." *McIntyre*, 34 F.4th at 99. By pointing to an absence of evidence about whether it reck-lessly disregarded § 1681e(b), Defendant carried its burden on its seventh basis for summary judg-ment. But Plaintiff responded with evidence showing a genuine dispute of material fact as to

whether RentGrow acted willfully – either intentionally or in reckless disregard of the FTCA – when it continued to rely on information obtained from TUBDS despite the knowledge gained during the *McIntyre* litigation. Unless one of the other listed bases for summary judgment entitle RentGrow to judgment as a matter of law, the Court finds that a reasonable jury could find for Plaintiff on his claim of willfulness.

As to the other six bases for summary judgment, the burden rests entirely on Defendant as the summary judgment movant to show that it is entitled to summary judgment. But most of these bases are no more than variations of matters discussed earlier in this Memorandum Opinion and Order. There is no reason to revisit each one. The Court has already discussed that it interprets *Walters* differently than RentGrow. That unpublished decision, moreover, has no special persuasive value and is not binding precedent. Thus, even if RentGrow interprets it correctly, this Court is free to disagree and to consider the case only for whatever persuasive value it might hold.

RentGrow contends that with "*Safeco*, the Supreme Court made clear that claimed willful violations of the FCRA that turn on disputed issues of statutory interpretation are available only" when one of these two circumstances are present. *See* ECF No. 107 at 13. It argues that there "is no Fifth Circuit or official regulatory guidance that would agree with Plaintiff's position as to the role of resellers." *Id*. at 13-14. It maintains that "the plain text of the FCRA, including §§ 1681a(f), 1681a(u) and 1681(f), all favor [its] interpretative position." *Id*. at 14. Based on prior arguments, the reference to § 1681(f) is clearly intended to mean § 1681i(f). *See id*. at 8 n.2.

With this contention, RentGrow misstates *Safeco*. The Supreme Court clearly stated that both circumstances must be present for the Court to find a statutory interpretation objectively reasonable. A statutory interpretation is not objectively reasonable unless the text is both "less than-pellucid" and there is a "dearth of guidance" to aid the interpretation. Pellucid text negates the need for guidance and guidance can remove the reasonableness of a given interpretation.

This Court, furthermore, has already found that RentGrow's role as a reseller does not

impact the applicability of § 1681e(b), but may be a factor as to what procedures may be reasonable. As the Court has already analyzed, § 1681e(b) clearly and expressly applies to all CRAs. Neither the definition of CRA (§ 1681a(f)) nor the definition of reseller (§ 1681a(u)) provide a reasonable basis to dispute that, by its terms, § 1681e(b) applies to all CRAs. Resellers are a subset of CRAs that do "not maintain a database of . . . information from which new consumer reports are produced." 15 U.S.C. § 1681a(u)(2). And § 1681i(f) expressly addresses the reinvestigation requirements that apply to resellers. That Congress distinguished between resellers and other CRAs in § 1681i(f) but made no such distinction in § 1681e(b) supports the clear and express interpretation that the latter provision applies to all CRAs, including resellers, whereas the former provision, by its own express terms, limits reinvestigation requirements for reseller CRAs. Although RentGrow continues to dispute the interpretation of § 1681e(b) as it applies to resellers, its interpretative dispute is not objectively reasonable. *See Rogue v. Corelogic Credco, LLC*, No. 1:19-CV-00260-BLW, 2020 WL 7061745, at *3 (D. Idaho Dec. 2, 2020).

Based on this analysis, § 1681e(b) is not "less-than-pellucid" as to its applicability to resellers. Instead, the statutory text of § 1681e(b) is clear, easily grasped and understood, completely comprehensible, and not in the least vague or ambiguous as to whether its requirements apply to resellers. The clear and explicit language of § 1681e(b) makes the provision applicable to all CRAs, resellers included. A reseller may avoid its applicability by not preparing a consumer report. And it can avoid violating the statute by following reasonable procedures to assure the maximum possible accuracy of the information provided in its report. While the reasonableness of procedures may be impacted by the CRA's status as a reseller, as has been discussed, resellers remain obligated to follow reasonable procedures.

With respect to its interpretation that § 1681e(b) does not apply to resellers, the above analysis negates any need to consider whether any authoritative guidance might have warned RentGrow from its interpretation of § 1681e(b). Thus, any argument for summary judgment on any

basis treating resellers differently due to the applicability of § 1681e(b) fails.

But RentGrow briefly argues that "[a]t the very least, Plaintiff's position that RentGrow was required to second guess the accuracy of the TUBDS data is not remotely 'pellucid' in his favor." ECF No. 107 at 14. This argument goes to the reasonableness of RentGrow's procedures and differs materially from interpreting § 1681e(b) as completely inapplicable to resellers. By its very nature, reasonableness of procedures is fact-intensive and dependent on the circumstances.

Although this argument refocuses the statutory interpretation to whether a procedure is reasonable, the objective reasonableness analysis focuses on the circumstances as a whole, including RentGrow's erroneous and objectively unreasonable interpretation that § 1681e(b) simply did not apply to it. It is difficult to reconcile RentGrow's objectively unreasonable interpretation with its brief argument that goes to the reasonableness of second guessing the accuracy of data provided by TUBDS. Its objectively unreasonable interpretation does not evaporate when RentGrow attempts to refocus on the reasonableness of its procedures. Its erroneous interpretation remains relevant to whether RentGrow used reasonable procedures when it prepared the consumer report regarding Plaintiff.

Moreover, even if the text of § 1681e(b) is less-than-pellucid as to "reasonable procedures," there must be a lack of guidance that might have warned RentGrow away from considering its procedures reasonable. RentGrow argues that Plaintiff cannot identify such guidance that its "procedures to accurately transmit the data provided to it by TUBDS were willfully unreasonable." ECF No. 107 at 14. But Plaintiff has pointed to knowledge gained by RentGrow during the *McIntyre* case. The Court has found such evidence sufficient to show a genuine dispute of material fact as to whether RentGrow acted willfully, whether its actions were intentional or in reckless disregard of the FTCA. While recognizing that such evidence may differ from the type mentioned in *Safeco*, *see* 551 U.S. at 70, interpreting fact-intensive terms like, "reasonable procedures," makes it reasonable to consider knowledge gleaned from prior litigation involving the same CRA.

Furthermore, the focus of § 1681e(b) is to require CRAs to use reasonable procedures to assure the maximum accuracy of information provided in consumer reports. The Court has already held that merely transmitting provided data accurately in a consumer report does not assure the maximum accuracy of information because nothing within such a procedure prevents a CRA from accurately transmitting known inaccurate information that had been provided by a third-party vendor. Similarly, even when a CRA has no basis to question the accuracy of information received from another CRA, the reliability and trustworthiness of the originating CRA remains a factor in determining the reasonableness of the reseller's procedures. Without some safeguards in place as to the accuracy of forwarded information or the trustworthiness of an originating CRA, there is room to question the reasonableness of a reseller's procedures to simply trust received information and accurately forward such information in a consumer report.

After considering all of RentGrow's arguments for summary judgment on the willful non-compliance claim and considering the totality of the circumstances in the light most favorable to the nonmovant, the Court finds that a reasonable jury could find for Plaintiff on such claim. This is a close case, but close cases typically result in summary judgment denials. The Court sees nothing that takes this case from the general rule that willfulness is a fact question for the jury.

## V. CONCLUSION

For the foregoing reasons, the Court **DENIES** *Defendant RentGrow, Inc.'s Motion for Summary Judgment* (ECF Nos. 102 and 107) and **DENIES** *Plaintiff's Motion for Partial Summary Judgment Against RentGrow, Inc.* (ECF No. 100).

**IT is so ORDERED.**

**SIGNED this 6th day of September 2023.**

**JASON PULLIAM**
**UNITED STATES DISTRICT JUDGE**